UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

GERBER SCIENTIFIC
INTERNATIONAL, INC.,

    Plaintiff,

    v.

ROLAND DGA CORPORATION and
ROLAND DG CORPORATION,

    Defendants.

3:06-cv-2024 (CFD)

**RULING ON MOTION TO DISMISS**

**I.**     **Introduction**

This is a patent infringement case between plaintiffs Gerber Scientific ("Gerber") and defendants Roland DG and Roland DGA. Defendant Roland DG has filed a motion to dismiss plaintiff's Second Amended Complaint under Federal Rule of Civil Procedure 12(b)(2), claiming a lack of personal jurisdiction. Gerber's initial complaint in this case named only Roland DGA as a defendant, but Gerber later moved to amend the complaint to add Roland DG as a defendant. At that time, Roland DG argued it should not be added as a defendant because this Court lacks personal jurisdiction over Roland DG. However, the Court granted Gerber's motion to add Roland DG, but without prejudice to Roland DG's moving to dismiss. Roland DG now does so.[1]

---

[1] The other defendant, Roland DGA, is not moving to dismiss.

## II.     Background[2]

All of the parties are involved in the computerized sign-making business through selling sophisticated printing and cutting machines. The patent at issue in this case was granted in 1996 and assigned at that time to Gerber. In involves a method and apparatus for computerized sign creation.

Gerber Scientific is a self-described "leader in providing end-to-end customer solutions to the world's sign making and specialty graphics, ophthalmic lens processing, and apparel and flexible materials industries." Pl.'s Opp. to Def.'s Mot. to Dismiss 3, May 21, 2010, ECF No. 163. The plaintiffs are incorporated under Connecticut law and maintain a principal place of business in South Windsor, Connecticut.

Roland DG is a self-described "leading manufacturer of an array of specialized and sophisticated computer peripherals for computer-aided design." Def.'s Mot. to Dismiss 3, April 30, 2010, ECF No.162. It is based in Japan and incorporated under Japanese law. Roland DGA is the exclusive distributor for Roland DG in the United States and throughout North and South America (with the exception of Brazil), and it is headquartered in California. Roland DG directly owns approximately 88% of Roland DGA stock, with the remaining 12% held by Roland DGA directors and officers. There are seven members of Roland DGA's Board of Directors. The Chairman of the Board, Bob Curtis, is the former CEO of Roland DGA. He also sits on the Board of Roland DG. Four other members of Roland DGA's board are present officers of Roland DG. The other two members of Roland DGA's board are part of Roland DGA's

---

[2]Unless otherwise noted, these facts are taken from the parties' memoranda, exhibits, affidavits, and deposition transcripts concerning the pending motion to dismiss. They are undisputed unless otherwise noted.

management.

Roland DG manufactures its machines in Japan. Roland DGA buys the machines from Roland DG in Japan, and then imports them into the United States. Roland DGA then advertises and sells those products to users in the United States, such as commercial printers and dealers of such equipment. Although defendants contend that "active involvement by Roland DG in Roland DGA's United States activities would make no sense," Gerber has offered substantial evidence showing that Roland DG is involved in Roland DGA's work in some ways. Def.'s Mot. to Dismiss 7. For example, Curtis testified at his deposition that Roland DGA needed Roland DG's Board of Directors to sign off on any expenditure by Roland DGA in excess of $250,000.[3] See Pl.'s Opp. to Def.'s Mot. to Dismiss, Ex. C, p. 86. Roland DGA is also required to provide budget forecasts to Roland DG and Roland DG accountants. Roland DG's employees occasionally come to the United States to train Roland DGA employees about the products they sell, and to work on products under warranty.

Employees at Roland DG visit the United States and stay abreast of Roland DGA's business. Roland DG personnel travel to Florida and Nevada to attend industry trade shows and to Roland DGA's offices in California to "gain insight into Roland DGA's marketing techniques." Def.'s Mot. to Dismiss, Ex. 2, ¶ 11. In an issue of its newsletter, "R-World," published in Spring, 2006, Roland DG published an article titled, "U.S.-Based Roland DGA

---

[3] Roland DG submitted a declaration by David Goward, the President and CEO of Roland DGA Corporation since 2008, in which Mr. Goward claims that no expenditures by Roland DGA need to be approved by the Board of Directors of Roland DG. Because the Court is to construe the affidavits and other supporting materials in the light most favorable to Gerber, see section III *infra*, it will be assumed that Roland DGA did need Roland DG's Board's approval for expenditures over $250,000 at least during Mr. Curtis's tenure as CEO of Roland DGA (1997-2007).

Corporation Expands It's [sic] East Coast Operations." The article announced the opening of a new product demonstration and training facility in North Kingstown, Rhode Island, and included a quote from the senior vice president of Roland DGA saying, "We are very pleased to offer our customers the benefits of an expanded East Coast presence." Pl.'s Opp. to Def.'s Mot. to Dismiss, Ex. M.

Roland DG has a website, www.rolanddg.com, written in English. On a tab labled "Download," users may download software affiliated with Roland DG's products, including the VersaWorks software which Gerber alleges is an infringing product.[4] Before accessing the software, users have to electronically accept a "Licensing Agreement" with Roland DG to use the software. Once the user clicks on the "Agree" button, the screen indicates that "Roland DG Corporation ('Roland') grants you a non-assignable and non-exclusive right to use the COMPUTER PROGRAMS ('software') under this agreement with the following terms ad conditions." In addition, information about Roland DG's "partners" is listed on the site, and when visitors to the website select United States from a drop down menu, they see contact information for Roland DGA and a link to Roland DGA's website. If a user then visits Roland DGA's website and clicks on the "Find a Dealer" button, he may search for dealers within the "Roland authorized dealer network." Garston Sign Supplies, Inc. in East Hartford, Connecticut is the listed authorized dealer for Connecticut.

---

[4]Roland claims that Gerber has never identified the VersaWorks software as an infringing product in its responses to interrogatories. See Def.'s Reply in Support of Mot. to Dismiss, 4. However, the Amended Complaint [Dkt. #156] claims the defendants' "computer hardware *and software*" for production of signs embodies the subject matter protected by the '135 patent. Gerber also lists VersaWorks among the "Accused Products" in its brief in opposition to this motion. See Pl.'s Opp. to Def.'s Mot. to Dismiss, 4.

Roland DG does not manufacture any products in Connecticut. It has no offices, bank accounts, or other property in the state. It does not pay taxes in Connecticut, and has no agent for service of process in the state.

### III. Applicable Law and Discussion

In a diversity or federal question case, personal jurisdiction is determined by the law of the state in which the district court sits. See Bensusan Rest. Corp. v. King, 126 F.3d 25, 27 (2d Cir. 1997). Therefore, in determining whether it has personal jurisdiction over defendant Roland DG, the Court applies the law of Connecticut. "When a defendant challenges personal jurisdiction in a motion to dismiss, the plaintiff bears the burden of proving that the court has jurisdiction over the defendant." Amerbelle Corp. v. Hommel, 272 F. Supp. 2d 189, 192 (D. Conn. 2003) (citing Metro. Life Ins. v. Robertson-Ceco Corp., 84 F.3d 560, 566-67 (2d Cir. 1996)). "The nature of the plaintiff's obligation varies depending on the procedural posture of the litigation." Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.3d 194, 197 (2nd Cir. 1990). Prior to discovery, the plaintiff may defeat a motion to dismiss by making only a prima facie case that jurisdiction exists. In this case, where there has been some discovery about Roland DG's contacts with the forum state,[5] "the plaintiff's prima face showing . . . must include an averment of facts that, if credited by the trier [of fact], would suffice to establish jurisdiction over the defendant." Id. These facts may be established by "affidavit and supporting materials," and such materials are "construed in the light most favorable to the plaintiff." Veritas-Scalable Investment

---

[5]While much of this discovery took place before Roland DG was added as a defendant, and is therefore not principally "jurisdictional discovery," the parties both present a substantial amount of evidence about the relationship and contacts between Roland DG and Roland DGA.

Products Fund, LLC v. FB Foods, Inc., 2005 WL 1925993 *3 (D.Conn. 2005) (internal citations and quotations omitted). In deciding this motion, the Court relies upon the declarations, deposition transcripts, and documents produced during discovery that were submitted by the parties along with their motions.

In determining whether it may exercise personal jurisdiction over Roland DG, the Court utilizes Connecticut's "familiar two-step analysis." Bensmiller v. E.I. Dupont de Nemours & Co., 47 F.3d 79, 81 (2nd Cir. 1995). The exercise of personal jurisdiction is proper if the defendant's conduct satisfies the requirements of the forum state's long-arm statue, and the conduct satisfies the requirements of the Due Process Clause of the Fourteenth Amendment.

**A. The Connecticut Long-Arm Statute**

Under Connecticut law, foreign corporations may be sued in the state, regardless of whether they transact business in Connecticut, on any of the following bases:

> (1) Out of any contract made in this state or to be performed in this state; (2) out of any business solicited in this state by mail or otherwise if the corporation has repeatedly so solicited business, whether the orders or offers relating thereto were accepted within or without the state; (3) out of the production, manufacture or distribution of goods by such corporation with the reasonable expectation that such goods are to be used or consumed in this state and are so used or consumed, regardless of how or where the goods were produced, manufactured, marketed or sold or whether or not through the medium of independent contractors or dealers; or (4) out of tortious conduct in this state, whether arising out of repeated activity or single acts, and whether arising out of misfeasance or nonfeasance.

Conn. Gen. Stat. § 33-929(f).

Gerber argues the Court's long-arm jurisdiction is authorized by both § 33-929(f)(3) and (4). Subsection 3 requires the "production, manufacture of distribution of goods" with the "reasonable expectation" that such goods are to be "used or consumed" in Connecticut. The

defendants do not dispute that some of Roland DG's products have been sold to users in Connecticut. Thus, whether the Court may exercise jurisdiction pursuant to subsection 3 depends on whether Roland DG had a "reasonable expectation" that the goods it manufacturers would be used in Connecticut. Roland DG argues it could not have "known" Roland products are distributed in Connecticut because less than 1/10 of one-percent of Roland DG's revenues come from sales of its products in Connecticut. Def.'s Mot. to Dismiss 23. But Roland DG misstates the requirements of the long-arm statute. What is required is merely a showing that Roland DG had a "reasonable expectation" its goods would be used in the state. Gerber has made that showing. The announcement in Roland DG's newsletter that a new Rhode Island facility would offer customers "an expanded East Coast presence" seems to indicate that Roland DG anticipated substantial sales in the Northeast. Roland DG officials have visited California to learn about Roland DGA's marketing techniques, which presumably include marketing to East Coast customers. Also, that the Chairman of the Board of Roland DGA is also a member of the Board of Roland DG creates an inference that Roland DG is aware of the sales strategies of its American subsidiary.

For these reasons, the Court finds that Roland DG had a "reasonable expectation" that some of its goods would end up in Connecticut. See Ensign-Bickford Co., 817 F.Supp. at 1028 (holding that a foreign manufacturer had a "reasonable expectation" that its goods would be used in Connecticut and that "this conclusion rests on the reasonable inference that the sale of a large number of devices to a firm with a nationwide distribution network will generally result in the sale—or at least the use—of one of those devices in the state of Connecticut.") Thus the exercise of jurisdiction under the Connecticut long-arm statute, specifically § 33-929(f)(3), is proper.

Gerber also argues that jurisdiction could be exercised under § 33-929(f)(4), because patent infringement is "tortious conduct" within the meaning of the statute. Since the Court concludes jurisdiction over Roland DG is proper under another provision of the state long-arm statute, that argument need not be addressed.

**B. Due Process**

Next, the Court considers whether Roland DG's rights under the Due Process Clause of the Fourteenth Amendment would be violated by the exercise of jurisdiction in this case. The Supreme Court of the United States has interpreted due process under the federal Constitution to require that any defendant who is not present in a state "have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." International Shoe Co. v. State of Washington, 326 U.S. 310, 316 (1945) (internal quotations omitted).

Personal jurisdiction may be premised on either general or specific jurisdiction. In order for a court to exercise general jurisdiction, the defendant's contacts with a forum must be "continuous and systematic." Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 416 (1984). Specific jurisdiction exists when the controversy that is the subject of the litigation "is related to or arises out of" a defendant's contacts with the forum. Id. at 414 (internal quotations omitted). In its opposition to Roland DG's motion, Gerber does not suggest that this Court may exercise general jurisdiction over Roland DG. Instead, Gerber argues Roland DG's acts subject it to specific jurisdiction in Connecticut. More precisely, Gerber argues that Roland DG's role in the distribution and marketing of various "Accused Products" infringes on Gerber's '135 patent, and that the distribution and marketing of those products is, in part, "related to"

Roland DG's contacts with Connecticut.

In patent cases, district courts must apply the law of the Federal Circuit in determining questions of personal jurisdiction. See, e.g., Simoniz USA, Inc. v. Motor City Wash Works, Inc., 2007 WL 3355400 (D.Conn. 2007). See also, Avocent Huntsville Corp. v. Aten Intern. Co., Ltd., 552 F.3d 1324, 1332 (Fed. Cir. 2008) (holding that when determining whether a court may exercise personal jurisdiction over a defendant, the Federal Circuit owes "no special deference to regional circuit law.") The Federal Circuit has stated a three-part test for specific jurisdiction, asking whether "(1) the defendant purposefully directed its activities at residents of the forum, (2) the claim arises out of or relates to those activities, and (3) assertion of personal jurisdiction is reasonable and fair." Avocent, 552 F.3d at 1332 (internal citations omitted). "The first two factors correspond with the 'minimum contacts' prong of the International Shoe analysis, and the third factor corresponds with the 'fair play and substantial justice' prong of the analysis." Id. (internal citations omitted).

The central disagreement between the parties is whether Roland DG "purposefully directed" its activities toward Connecticut residents. One way plaintiffs may demonstrate such purposeful direction is by relying on the "stream of commerce" theory. See Asahi Metal Industry Co. v. Superior Court of California, 480 U.S. 102 (1987). Under this theory, by placing its products into the "stream of commerce"— the chain from production to distribution to sales—the defendant should be aware that a product may end up in the forum state and the defendant may be subject to a lawsuit there. While the Asahi Court was divided on whether the stream of commerce test also required some additional conduct by a foreign defendant for the proper

exercise of jurisdiction,[6] it is clear that Roland DG has minimum contacts with Connecticut under either a more relaxed or more restrictive version of the stream of commerce test.

Roland DG sells its products to its American distributor, Roland DGA, which has a national network of authorized dealers for Roland products. Roland DGA has one authorized dealer in East Hartford, Connecticut, and others in states that border Connecticut. Roland DG is likely aware, or should be aware, that its products are sold in Connecticut. Gerber has introduced sufficient evidence to show that Roland DG cooperated with, or possibly even directed, the introduction of Roland DG products into the American market. Four officers of Roland DG and one board member (Curtis) sit on Roland DGA's board, and employees of Roland DG frequently visit the American offices of Roland DGA to learn about Roland DGA's marketing techniques. Employees of Roland DG frequently attend trade shows in the United States to monitor trends in the industry and learn from Roland DGA's marketing techniques. One Roland DGA employee testified that Roland DG sends Roland DGA content to be included in marketing materials.[7] Roland DG announced in its newsletter, "R-World," that a new Roland DGA facility was opening in Rhode Island to offer customers "an expanded East Coast presence." And finally, Roland DG allows users anywhere in the United States, including in Connecticut, to enter into a

---

[6]Justice O'Connor wrote in <u>Asahi</u> for a four-justice plurality that, "The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State." See <u>Asahi</u>, 480 U.S. at 112. However, Justice Brennan also wrote for another four-justice plurality that, "The stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale . . . Accordingly, most courts and commentators have found that jurisdiction premised on the placement of a product into the stream of commerce is consistent with the Due Process Clause, and have not required a showing of additional conduct." See <u>Id.</u> at 117.

[7]See Pl.'s Opp. to Def.'s Mot. to Dismiss, Ex. L, p.58.

licensing agreement with the company and download software for its machines. These activities amount to "purposeful direction" of Roland DG's activities toward Connecticut consumers.[8]

The second prong of the test for specific jurisdiction requires that the claim arises out of or relates to the same activities which establish the defendants' minimum contacts in the forum state. This is the case here. Gerber's claim alleges that the Roland DG's computer hardware and software for the "print/cut" production of signs and other durable graphics, which were sold to users throughout the United States, including Connecticut, embodies the subject matter protected by the '135 Patent. Because such products are sold by an authorized dealer in East Hartford, Connecticut, and at other retailers in New England, and because Roland customers may directly download allegedly infringing software from Roland DG's website, the claim "relates to" Roland DG's contacts with Connecticut.

Finally, the third prong of the test requires that this Court's exercise of jurisdiction be reasonable and fair. The Supreme Court has listed several criteria to be used in making this determination, including

> the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies.

---

[8]This case can be distinguished from In re: Foodservice Inc. Pricing Litigation, 2009 WL 5064468 (D.Conn. 2009) (Droney, J.). In that case, the Court found it could not exercise personal jurisdiction over a Dutch holding company whose U.S. subsidiary was alleged to have engaged in a price-fixing scheme. In that multi-district litigation case, the Dutch holding company guaranteed the debt for its U.S. subsidiary, and may have known about the price-fixing scheme. The Court ruled those actions were insufficient to establish minimum contacts with the forum states. By contrast, the level of coordination between Roland DG and Roland DGA (who sells to at least one authorized dealer in Connecticut), Roland DG's offering of software on its website, and its advertisement of "an expanded East Coast presence" all indicate that Roland DG does have sufficient minimum contacts with Connecticut.

Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476-77 (1985) (citations and internal quotations omitted). The Supreme Court has noted that the bar is high for a defendant who claims jurisdiction is lacking for reasons of fairness; the defendant must present a "compelling case." See Burger King, 471 U.S. at 477.

In this case, the burden Roland DG would face in defending this lawsuit in Connecticut does not outweigh the interests of the plaintiff and the forum. Roland DG claims it would face "a significant burden if forced to defend itself half-way [sic] around the world in a legal system that is extremely different from the Japanese system." Def.'s Mot. to Dismiss 24. However, Roland DG has applied for patents from the U.S. Patent Office, and has retained counsel in Washington, DC and Boston for that purpose. Also, Roland employees routinely travel to the United States. Roland DG has sent its employees on various occasions to trade shows in Florida and Nevada, and to the Roland DGA offices in California. Finally, "modern technology may be able to overcome many of the difficulties associated with travel" to a foreign court. Centrifugal Force, Inc. v. Softnet Communication, Inc., 2009 WL 1059647 (S.D.N.Y. 2009) (holding that to require a Polish *pro se* defendant to litigate his case in New York did not violate notions of fair play and substantial justice.) The Court does not find that defending this case in Connecticut would be unduly burdensome for Roland DG.

Moreover, other important interests are served by the exercise of jurisdiction here. Gerber's interest in maintaining the manufacturer of the allegedly infringing products as a party to this case is significant. The interest of the forum state is high, since Gerber is a Connecticut-based corporation. Therefore, the Court finds that exercise of personal jurisdiction over Roland DG is reasonable and fair.

## IV. Conclusion

For the reasons set forth above, the defendant's motion to dismiss [Dkt. 162] is DENIED.

SO ORDERED this  20th  day of September 2010, at Hartford, Connecticut.

    /s/ Christopher F. Droney
**CHRISTOPHER F. DRONEY**
**UNITED STATES DISTRICT JUDGE**